Case number 19-5466 and 5467, Kruti Desai et al. versus Charter Communications LLC, argument not to exceed 15 minutes per side. Mr. O'Quinn, you may proceed for the appellant. Thank you, Judge Gibbons, and may it please the court, John O'Quinn on behalf of Charter Communications. There are at least three fundamental flaws in the district court's to go to the jury based on the one-off use of a made-up word printer gate that had no settled pre-existing meaning and that on its face is not a clear and unequivocal assertion of theft or criminality as Kentucky law requires for a first aid theory. Second, it directed a verdict for plaintiffs on Charter's truth defense even though a reasonable jury could have found that the plaintiffs knowingly took the printers without authorization, which is the technical definition of theft. And third, it precluded Charter from invoking qualified privilege even though Kentucky case law identifies unprivileged communication as an element of a defamation claim and it never puts the burden on the defendant to prove privilege and even though Charter sought leave to amend out of abundance of caution years before trial. Charter is entitled to judgment, but at a minimum, the court should order a new trial. Now, plaintiff's whole case turns on the notion that the jury was entitled to decide whether the use of printer gate constituted defamation per se and respectfully, that is not a question that was for the jury. This court and Kentucky courts have been consistently clear that whether a defendant's statement is prima facie actionable on a per se theory as opposed to a per quad theory is a question of law for the courts and indeed for 85 years, the law in Kentucky has been clear that to be actionable per se, the words must be, quote, defamatory on their face when stripped of all innuendo, colloquium, and explanatory circumstances. That, of course, is the Kentucky Supreme Court. What do we do with the cases that allowed Rob, con artist, and Steele go to the jury? It looked to me like those were possibly ambiguous and the jury was allowed to consider the context and whether that was defamatory in that situation. Sure. Judge Nalbandian, I think that involves a situation where you have words that on their face have a technical meaning, in those cases imputing theft or criminality, but also had a colloquial meaning. If you look at the elder treatise that both parties cite frequently, at page 61 of that treatise, it says the only time that intended meaning presents a jury question is whether there's a legitimate question concerning whether words were used in a colloquial sense that was non-defamatory. So all of those cases, Rob, Steele, con artist, those were the examples in a number of ways. I'm thinking about Yancey as the con artist case. It seemed to me that the language the court used was fairly broad. If the word is capable of having a defamatory meaning, the jury gets to on its face criminal and then there might be a colloquial meaning, then it goes to the jury. I understand your argument, but I don't see any cases that have explicitly drawn that distinction. I guess that's what I'm struggling with. Well, I think Judge Nalbandian, you have the cases that very plainly say that it has to clearly and unequivocally connote criminality. For example, if you look at York versus Mims, a 1918 case that's cited in the Elder Treatise, it says words that do not clearly import the commission of a crime are not actionable per se. I think you have to reconcile the cases that say it has to be clear and unequivocal on its face with the cases that say, well, yes, word is also capable of having a colloquial meaning. In that circumstance, it is appropriately a question for a jury. For example, if you look at Elder at page 61, it says it's reversible error for a court to permit a jury to determine whether unambiguous words were meant or intended to charge plaintiff with criminal offense. Then it makes the point that I made earlier that the only time that intended meaning presents a jury question is whether there's a legitimate concern over whether the words were used in a colloquial sense. I think that makes sense from a policy perspective. Your argument is, I guess, it's essentially a safety valve for the defendant. I mean, if I have a word that is on its face criminal or something, there's a safety valve for the defendant to say, oh, I didn't mean rob. I meant the Dodgers were robbed in the World Series or that. It just seems odd to me. It would be just a one-sided kind of pro-defendant safety valve. I'm not sure how the policy works there. Judge Nel-Bandy, I think the policy makes perfect sense in that the whole theory of defamation per se is that the words themselves necessarily damage. Put it this way. Everyone's on notice that if you use these words, they're going to be damaging, but yet sometimes there are uses of those words that are not damaging. What that does is because those words are understood, and Black's Law Dictionary in talking about what is actionable per se, says it's a, quote, fact of common notoriety established by general consensus that such words necessarily damage. And so it makes sense that it would run in one direction because if you're talking about the whole premise is that they no longer have to prove damage to reputation. But at the same time, there are some times where if we're at line to get some food and I get the last hamburger and you say, oh, you robbed me of that, that that was not intended, and the jury could reasonably conclude that that wasn't being used in the technical sense. But when you're using a term that it at most, at worst, is an oblique reference, well, that is the very definition of innuendo, which case after case specifically says, Sweeney at page 384, that the general rule is that libel depending upon innuendo is per quod and is only actionable for such special damages as directly and proximately caused it. And that's what we're dealing with here. And I think it's important to recognize that the plaintiff's theory is not that this is some term that the audience knew already came with a meaning, that it's not, they're not suggesting it was like a term of art that was known in the community. Their argument is that the audience could infer that it was intended to suggest criminal theft from other things that were said in the presentation, other presentations, and respectfully, that is at worst an oblique statement, the very definition of innuendo. Now, I want to be clear, that doesn't mean that the plaintiffs wouldn't have theoretically had a cause of action to bring, but it would be a cause of action for defamation per quad, in which they would have the burden of proving damage to reputation, as opposed to an action per se. And they can't make out a case per quad, they haven't tried to, and that's why they're trying so hard to expand per se. Now, I realize that I'm getting low on time, unless the court has further questions on this, which I'm happy to answer. Let me say a few words about the other issues, specifically the truth defense and perhaps qualified privilege time permitting. So with respect to the truth defense, at a minimum, the court should order a new trial in which charter is permitted to present its alternative defense of truth to the jury. Now, the plaintiffs have told their version of the story in their brief, but of course, in this case, all inferences have to be drawn in favor of charter, because the district court took this issue away from the jury. And respectfully, there are more than one way to And the question was not whether charter had directly accused the plaintiffs of criminal theft, or that a charter witness had expressed a personal view about whether or not they had intended to steal, had intent to steal. The question was just whether there was some evidence from which a jury could find one or more of the plaintiffs had taken or exercised control over the property of another with the intent to deprive them thereof. And to be clear, there's no dispute this was charter property. There's no dispute that they took it for personal use. The only thing they're arguing is that they believe that they had authorization. I take it your argument on this point depends on the plaintiff's knowledge of the company policy, too? Well, Judge Nalbandia, that is one of the things from which the jury could have inferred. I think they're really four. It could have inferred intent from the inconsistency of their conduct with the employee handbook and charter policy. Second, it could have inferred it from the failure to ask someone in HR or an actual manager before they took a $400 piece of equipment off site. It could be from the inconsistency in their stories. Ms. Showalter, was there any dispute that they were told by Showalter or whatever that they could take the printers? I mean, there wasn't any dispute that she said, take these, we can't use them, right? Judge Nalbandia, I don't think there's any dispute that she said that they could have the printer and gave some of them two, even three, even three printers. But the question is whether they knew that they were in fact authorized to take these. Ms. Showalter was an administrative assistant, a secretary to some of the managers. She didn't have authorization. There's no dispute about that to give them. And they knew or should have known reasonably that she didn't have authorization. And part of the best evidence from which the jury could have inferred intent is the fact that you had a coverup, you had lies. That is specifically Mr. Popp represented to his domestic partners, a fellow charter employee, that he had received several printers as part of an employee incentive rewards program. That wasn't true. And you can see at page 172, record 172, page 3684. Mr. O'Quinn, your time is up. If you can finish your sentence and then. Thank you, Judge Gibbons. He represented to his domestic partner that he had gotten these through some rewards program, which he didn't. And Ms. Parkerson also denied receiving a printer when she was confronted about it at R173, page 3951. Thank you, Judge Gibbons. All right, Ms. Blumkatz, is that right? That's correct, Your Honor. Good morning, everyone, and may it please the court, Rachel Blumkatz on behalf of the appellees. I'm going to get right into the issue of per se and per quad that Mr. O'Quinn raised, right? The rule of law that applies in Kentucky, as explained in the Yancey case by the Kentucky Supreme Court, as Judge Nalbandian said, is that when you have a statement when viewed in context is susceptible to two meanings, one that imputes criminality and one that doesn't, then it becomes an issue for the elder law treatise here. But the elder law treatise is exactly consistent with Yancey here. And it says, normally, right, normally, this is a question of law for the court. And I'm just going to read it off here. So I don't misquote it. If however, the words are capable of two meanings, one innocent and the other slanderous, the jury will determine based on the totality of the crime. That's section 1.07c on pages 60 to 61. And we really have like 100 years of Kentucky case law showing that these questions go to a jury. We have old cases with very innocuous statements saying something like he moved a tree. Well, in isolation, this doesn't seem like it's alleging anything at all. But if the reasonable listener understands that we're talking about moving a tree that marks the survey of the property lines, again, these are old cases, right, then it can impute criminality in extrinsic circumstances demonstrating what that reason why, why isn't there a difference between putting something into context, like, for example, you're a liar, but I'm just calling you a liar versus I'm accusing you of lying in a sworn statement. So we need extrinsic evidence to say which of those circumstances, but it doesn't actually go to the question of what the word lie means that that's not we don't use extrinsic evidence, or the jury doesn't get that those are two different uses of evidence, right? It's a little different. But Your Honor, Kentucky is really clear that what you're using extrinsic evidence for is to understand how that reasonable listener would have understood the statement. That's the whole point, would they have understood this as imputing theft or criminality, because that would be really harmful. You're not using extrinsic evidence to figure out some secret meanings or, you know, what this word meant years and years ago, you're trying to figure out what that reasonable listener understood, right? And that's why statements like con artists, which really has no inherent is this criminal? Is this not a question like that goes to the jury, we have the stringer case to a quite recent case, Your Honor, the phrase that the court hung its hat on in that case, was there was more to it than that, right? That doesn't use any sort of buzzword. Right, but still the court focused on it, because in context, right, the employees that heard that could understand that their employer was accusing them of theft, and actually, indeed, more than the theft that was arguably true that they had stolen these planes. What do we do? What do we do with the language? And I know Judge Bertelsmann used it in Sandman, but it comes from other cases that a public that something is per quad libelous, if one must resort to extrinsic evidence of context or circumstances in order to comprehend the defamatory nature of the words, right? explain reconcile that language with context in this case? Yes, Your Honor, what those cases are getting at is that in per quad cases, you have to use extrinsic evidence in order to show your damages. The district court also looked at all of these cases very clearly, right? In per se cases, you don't need extrinsic evidence to show your damages, because there is a presumption of harm that follows. There's a conclusive presumption of malice, and then a presumption of harm. In the per quad cases, you have to rely on extrinsic evidence to show how this harmed you, right? How in context was this statement like, causing you some sort of harm because we don't have the presumption like we do for the per se categories. This is really clear in the old Elkins case, for example. And even the judge in this case said, you know, that charter was really taking these statements, the statement from stringer, for example, out of context, very clear, again, and stringer, that the statement was ambiguous, went to the jury, and you could uphold that that jury verdict. And it wouldn't really make any sense to have this requirement that you have to blind yourself to what that reasonable listener would understand. You have a statement that says, gosh, what Jones did was really worse than Smith. Well, if everybody in the audience knows what Smith did, right, that could be accusing Jones of doing something really bad, indeed criminal. The question is, what is the message that the judge played this gatekeeper role, right? The judge stands there and looks in context and says, could a reasonable audience member have understood this as imputing criminality, right? If not, the case is dismissed, or at least it's not actionable per se, maybe it then goes on and perquat. But again, as Elder says, as Yancey says, as we see in stringer, as the restatement also says, and we know, for a statement, I mean, there is the language in Elder and he's quoting other cases about the clear and unequivocal. Well, let me address that, Your Honor. So one of the main cases that Mr. O'Quinn relies upon is the Sweeney case, right? The Sweeney case is one where the court didn't have to get into this distinction between per se and perquat, because they said, however you cut it, it was an insurance letter in that case, however you cut it, this was not defamatory, not per se, not perquat. So the court wasn't really getting into that distinction. As to the clear and unequivocal language that you're discussing, Judge Nalbandian, that is a quote from Stringer. And interestingly, you know, I think Charter briefed this issue five times below, it never relied on that language. And that's because that language is really taken out of context. Indeed, in Stringer, the statement was not clear and unequivocal, right? It couldn't have gone to the jury in Stringer if it had to be clear and unequivocal. What that statement is, and you look at it in context, it's a quote from the Elder Law Treatise explaining which crimes can give rise to defamation per se. So does it have to be a horrible crime like murder? Did it have to cost a lot of money? And the Elder Law Treatise is explaining, no, it has to be something that's clear and unequivocally a crime. But the statement doesn't have to be unambiguous. And Stringer, of course, goes on to say that you look at this in the perspective of the reasonable listener, and taking into account the facts and things that that reasonable listener would know in context, if it can give rise to the imputation of criminality or hit one of the other per se factors, then the jury can reasonably conclude that it did. That's exactly what happened in this case. The district court judge, you know, did this to a T pursuant to Kentucky law. And again, I think there are cases that say this go to a court or, you know, are very narrow, because in many cases, it is that way. Like Yancey says, you know, normally, this is a question for the court, but not always in cases like this, where the reasonable listener could understand this. And is it a reasonable, it's a reasonable listener, but it's also is it the audience, a reasonable charter, audience member employee who knew what buzzkill was and knew what the other one was and knew that people had gotten fired for printers? I mean, that's is it that reasonable person? Or what? How do you slice that? Yes, the Kentucky court is clear that it's the reasonable member of the audience, right? And that makes sense, because you're worried about the harm to people have known in her exactly like that in the stringer case, judge now, they in the end, what would these employees have known? And they said, Well, there was more to it than that. You know, the employees there knew there was this issue with with stealing the claims candy and eating this discarded candy. So you're talking about the reasonable member in the audience. Indeed, you know, you could have a statement that was, you know, use particular terms of art or things like that, that are used in a company or just use in a particular community, you'd be able to educate the jury about how that reasonable listener in the audience would understand it. Your Honor, I'd love to address the truth defense if I, if I may, but I of course, want to answer any more questions on this point. I'd actually like to ask you about your punitive damages. So it's, it's not clear to me why you aren't bound by this Kentucky statute that says that it has to be proved by clear and convincing evidence. I mean, when when you get a presumption, that seems to be a presumption by the by a preponderance of the evidence. Why isn't that exactly right? Yes, Your Honor. Under Kentucky law, when you have defamation that's actionable, per se, it gives rise to a conclusive presumption, not just a presumption as a matter of preponderance of the evidence, it gives rise to a conclusive presumption of malice. And that conclusive presumption of malice, of course, satisfies the clear and convincing evidence standard. It's almost like, you know, you got a directed verdict on that point as a matter of law. But in order to get a directed verdict, you'd only need a preponderance. You don't need a convincing, right? I mean, what that if you had to prove the claim, you'd only have to prove it by a preponderance. So the law makes you not prove the claim, but it doesn't say that it's beyond a reasonable doubt. For example, that that's correct, Your Honor. But I think that's the kind of asymmetry and the standards of proof is is how the presumption works. Even if you don't take into account the statute for a second, you get a presumption arises of malice from proving something is actionable, per se, by preponderance that still gives you a conclusive presumption of malice. The other side can't come back and say, well, that's only a presumption that was proved by the preponderance of the evidence. We have clear and convincing evidence or beyond a reasonable doubt that we didn't ask with malice. No, the asymmetry is something that the Kentucky Supreme Court has within its presumption of malice here. And indeed, since Section 411 was enacted, the Kentucky courts, including the Kentucky Supreme Court and Yancey, has continued to say that this presumption of malice that's conclusive and gives rise to punitive damages still applies. That hasn't changed in the courts of appeals, even though they've applied it here. Well, that question wasn't really squarely presented to them and Yancey, was it? It's just sort of a one off line. Well, it wasn't squarely presented. But there we have lots of now rely on the statute either. I mean, they don't cite the statute. They don't talk about statute. Yeah, we don't have a case that's directly on point, Your Honor. And I understand that. I think one of the most helpful cases is very closely analogous. I'm getting an echo. I'm getting an echo. I'll try. I'll mute. Excuse me. Am I only hearing that echo? Oh, that's better. Okay. Excuse me. So one of the important things here to Judge Larson is that 411.184, the statute that you're discussing, has to be an interpreted in a way that would avoid problems with the Kentucky Constitution, right? Kentucky has this jural rights doctrine, which means that all of the common law rights that existed at the time of the ratification of the Kentucky Constitution, the 1891 Kentucky Constitution, are essentially enshrined in that Constitution, such that they can't be abrogated by the legislature. And while the Kentucky Supreme Court didn't address the clear and convincing part of the statute, they did address the malice part of the statute. And that applies here, right? In Williams versus Wilson, which we cite in our case, the plaintiff said, you can't make me prove malice in order to get punitive damages, because at common law, I could get them with just gross negligence. And the Kentucky Supreme Court agreed. They said, you can't elevate the standard from how it was at the common law for getting punitive damages. Well, the same reasoning applies here. You can't change the presumptions and things that existed at the common law. And again, the Kentucky Supreme Court found that sections of 411 completely invalid. Yeah, but you don't have it. Oh, I'm sorry, Judge Givens, go ahead. What's the best case for us to look at to understand this doctrine you're advocating for? Yes, Your Honor. The best case that I would suggest is Williams versus Wilson. And that's 972 Southwest 2nd, 160. It's a 1998 case from the Kentucky Supreme Court. And I think it very clearly tells us it's a doctrine that's different to this doctrine. And it's the same common law right that existed at the time of this act. On the truth defense, just very quickly, Your Honors, I'd like just to note that charter, its entire trial strategy was to avoid making it seem like it was accusing the plaintiffs of that. Defense counsel, an opening statement tells the jury, I'll just quote, you will not be asked to decide whether or not plaintiffs engaged in criminal behavior, right? That's the truth defense. And they took it right off the table, right off the bat. I see that my time has expired, unless Your Honors have further questions. All right, Mr. O'Quinn, your rebuttal. Thank you, Judge Givens. Let me start where my colleague finished. On the truth defense, charter was entitled to put on its defense in the alternative. And it was entitled to speak with a velvet glove as opposed to an iron fist. And there was no waiver, which of course, was not the rationale that the district court used. And indeed, two pages later in the transcript, charter specifically said, quote, if the term printer gate makes you think the printers were being taken from the company without permission, that's exactly what happened. It is not false. That's page 4396 of the records. Now, I want to come back to the per se versus per quad, because I think it's very important. And it's important for reasons that Judge Larson, you were alluding to, with respect to the issue of punitive damages, because under plaintiff's theory, by proceeding under a per se theory, they're able to bootstrap their way not only to not having to prove damages, that is damage to reputation, but they are able to bootstrap their way to a presumption of malice, which can bootstrap their way to punitive damages, despite Kentucky's statute requiring clear and convincing evidence to prove it. But more fundamentally, I think the plaintiff's theory simply proves too much. In their view, every single case could go to the jury on the question of whether or not the jury could find that that was actually some accusation that falls within the per se category. And I think it's important to recognize the definition per se is not limited to accusations of theft or even criminality. It's much, much broader. And under their theory, there would be no gatekeeping role for the judge, because you could always say that somebody could infer from the circumstances that this was intended to be a charge of one of the categories for per se. Now, they rely on the language that says it's susceptible to meanings, that that's an issue for the jury. But respectfully, I think that is in a situation where on its face, it carries a technical criminal meaning, but it is also susceptible to an innocent meaning. That's exactly what the Elder Treatise says. Now, to be sure, there are contexts where, as you put it, Judge Nalbandian, you have to have an understanding of connecting the statement to the facts to know what was being referred to. But that is different from trying to give meaning to the words themselves. The latter is innuendo. And that is clearly, consistently, and in every single case, exactly what the courts say must be stripped away for the judge to decide whether or not they can proceed on a per se theory. There's a difference between saying this is what it refers to. So the swore a lie, for example, is the classic case of it is a charge of criminality. If it's made about a statement in the courtroom, it is not if it's made about a statement on the playground. And the same was true with moving a stump. If it was moving a boundary marker, which was a criminal offense, then it would be, and if it wasn't, it wasn't. But that's different than what you have here, which is, at most, an oblique statement, which is the very definition of innuendo. Now, my colleague says much about the various statements in Stringer, and Stringer refers to, Judge Abanian, were you asking a question? Yeah, sorry, I was muted. Do you agree, though, that the restatement is inconsistent with your position? Judge Abanian, I think the restatement is unclear. And I think that this is an area where, frankly, the law really does vary from jurisdiction to jurisdiction. There are any number of cases that make the point that what it means to be per se versus per quad can vary from jurisdiction to jurisdiction. But I think the Kentucky law has been consistently clear that in deciding if you can proceed on a per se theory, that you have to traveler's insurance case, 137 Southwest 2nd at page 1111. And it said, we might draw the inference from the language used that appellant had been suspended, that that was an inference that something improper had happened, but we cannot presume as a matter of law that such an inference would be drawn. I see that I'm out of time, but I'm happy to answer any questions that the panel may have. Okay. Thank you both for your argument. We'll consider the case carefully. Thank you, Judge Gibbons.